O’NIELL, C. J.
 

 (dissenting). I respectfully dissent from the rulings on bills of exception 1, 2, 3, 5, and 7, where it appears that the five veniremen referred to in the bills of exception were declared to be qualified to serve as jurors in this case. The fact that they had contributed their money to what was called “the Sam E. Duh'on fund,” for the relief of the widow and orphans of the murdered Sam E. Duhon, might not, alone, have disqualified them to serve as impartial jurors in a prosecution for the murder of Duhon. The fact that two of the five veniremen were members of the same church that Duhon was a member and an officer of, and attended the same Bible class that he attended, would not, of itself, have disqualified the veniremen to serve as impartial jurors in a prosecution for the murder of Duhon. But the fact that three of these five contributors to the Sam E. Duhon' Fund, including the two who were members of the same church that Duhon was a member and an officer of, and were members of the same Bible class that he belonged to, were also members of the so-called Invisi
 
 *601
 
 ble Empire, Knights of the Ku Klux Klan, of which Duhon was a member, and the fact that two of these three members of the Ku Klux Klan attended Duhon’s funeral, wearing the Ku Klux regalia, did seriously endanger the impartiality of their judgment as jurors, though they may not have realized it. Of course, these veniremen said, on their voir dire, that they would give the defendants a fair and impartial trial. But did any venireman ever say, on his voir dire, that he would not be true to his oath as a juror to be fair and impartial? Human nature does not warrant a venireman’s being the judge of his own strength or impartiality:in that respect. The only case in which I have ever heard or read that a member of an organization admitted, under oath, in a judicial proceeding, that he would hold his oath of allegiance to the organization above his' obligation to obey the laws of his country and his state was the famous Bier Rouge trial, nearly two years ago, when the Attorney General sought in vain to account for the mysterious disappearance of Watt Daniels and Richards. We are reminded of that famous case by another bill of exceptions (bill No. 45), where it appears that the prosecuting attorneys in this case were allowed, over the defendant’s protest, and for the purpose of impeaching or discrediting a defense witness in the estimation of the jury, to bring out the fact that the witness had testified as an expert in the science of pathology, as a witness called by the Attorney General, in the Bier Rouge or Biorehouse investigation of the disappearance of Daniels and Richards, in which investigation, we know, as a matter of history, this organization, called the Invisible Empire', Knights of the Ku Klux Klan, openly defended the men who were accused or suspected of having murdered Daniels and Richards.
 

 I concede that a venireman’s being a member of a fraternal organization of which the victim of a murder was also a member should not. of itself, disqualify the venireman for service as an impartial juror in a prosecution of a person charged with the murder. But I do not consider it quite right to compare membership, or citizenship, as I believe it is called, in the so-called Invisible Empire, Knights of the Ku Klux Klan, with' membership in the generally considered worthy fraternities, like the Blasons, the Knights of Columbus, Knights of Pythias, Oddfellows. Elks, Druids, Woodmen of the World, etc. The members of those organizations do not conceal their identity. They are proud to display it. The members or citizens of the Invisible Empire, Knights of the Ku Klux Klan, on the other hand, were so disposed to conceal their identity as members of the organization, to such an advantage over nonmembers, that the Legislature of this state deemed it necessary, at its last session, to enact three penal laws to compel them to make known their-identity and leave off the hood and mask. I refer, of course, to the Act 2 of 1924, requiring the head officer, of every such organization to file with the secretary of state a list of the names and addresses of the members of the organization, and making it an offense, punishable by imprisonment, for any such head officer to fail to comply with the statute; and the Act 3 of the same session, making it a misdemeanor for any one to wear a hood or mask, or other facial disguise calculated' to conceal his identity, in any public street or highway or other public place; and the Act 4 of the same session, making it a felony for any one to wear a disguise in the commission of certain acts which would be otherwise only misdemeanors. Which three statutes, as we know, were enacted in fulfillment of a pre-election pledge made by the candidates for Governor in the last campaign, in response to a popular sentiment against the secret activities of members of the Ku Klux Klan.
 

 It is with reluctance that I refer to these deplorable things of the past, which ought to be forgotten. But I am constrained to be
 
 *603
 
 frank in my disapproval of the rulings made in this case.--
 

 It is true that the lawyer who was employed by the widow of Sam E. Duhon to assist in this prosecution announced in open court, when the first of these bills of exception was taken, that he was “not receiving one penny either directly or indirectly, of the money contributed to the family of Mrs. Duhon, or from the fund known as the ‘Sam E. Duhon fund.’ ” But he did not say what fund his fee came from. It could not have been paid by the widow who employed him if she had not been aided by the contributions for her -relief. In the case of the State v. Moore, 48 La. Ann. 380, 19 So. 285, where the court set aside a .verdict for retailing intoxicating liquor without a license, it was said:
 

 “The members of an association to aid in the prosecution of a particular class of offenses, and those in sympathy with the association and who contribute money for the pur•poses of the organization, are not competent jurors to try an indictment for the offense of the class, to prosecute which the association is founded and the money subscribed.”
 

 I concur in the rulings on bills 6, 8, and 11, with regard to the court’s having sustained the State’s challenges of jurors for cause, on the ground merely that the defendant in a criminal prosecution has no right of selection, but only the right of rejection, of any particular juror.
 

 As to bills 22 and 25, it is .virtually admitted in the majority opinion that the judge 'erred in sustaining the objections made by the prosecuting attorneys. The errors deprived the defendants of their right to impeach two important witnesses who testified against them; and I see no reason why the errors should be deemed harmless. The question propounded by the defendants’ attorney was in proper form, as far as it went. The judge did not suggest, when he sustained the prosecuting attorney’s objection to the question, that it might be put in another form. The defendants’ attorneys therefore did not know that the question would be allowed in another form. It is sufficient to say, however, that the question was a proper one, in the form in which it was put, because the witness in each instance might have admitted that he had made the impeaching statement that was attributed to him. I dissent from the rulings on these bills of exception.
 

 As to bill 24, my opinion is that the note of evidence should prevail over the judge’s recollection as to whether the defendants’ attorneys requested that the jury should be withdrawn while the evidence was being taken on theirl bill 23. The very purpose of the Act 113 of 1896, requiring that the facts shall be taken down in writing by the clerk when a bill of exceptions is reserved, is to protect the defendant against the judge’s being afterwards mistaken in his recollection of what occurred.
 

 I dissent from the rulings on bills 26 and 27, taken to the-judge’s rulings sustaining the objection of the prosecuting attorneys to the questions propounded by the defendants’ attorneys to Lee Manuel, a very important witness against them, under cross-examination. The purpose of the cross-examination was to show that Robert Dunn could not have ridden from the town of Vinton to his home at the time when the witness, according to his testimony, heard shots fired in the direction of the Dunn home. The evidence showed that Robert Dunn was in Vinton until 9 o’clock that night. The witness, Lee Manuel, said that he heard the shots in the direction of the Dunn home about 9 :15 that night. It was therefore highly important for the defendants to éhow, as accurately as they could show, what time elapsed from the moment when Manuel heard the shots to the time when he looked at his watch. The judge should have allowed the defendants’ attorneys to cross-examine Lee Manuel liberally upon everything that he said he did between.
 
 *605
 
 the time he heard the shots until he looked at his watch, for these men are condemned to die for a very foul murder, on circumstantial evidence only.
 

 As to bill 30, it appears to me that the statement in the majority opinion that the suspicious character whom the witness saw was at the railroad station at Vinton is a mistake. The witness, McPherson, was the railroad agent for the Kansas City Southern Railway at Starts Station, near which station the bodies of the two murdered men were found, more than 14 miles from the'defendants’ home. McPherson, being a witness for the state, testified, under cross-examination, that, about midnight on the night of the homicide, he saw a suspicious character, with his hat or cap pulled down over his eyes, hiding in the darkness, and seeming very nervous; and that the man bought a ticket for Beaumont, Tex., and left on the south-bound train that night. The witness, having said that he had discussed generally with the people of his neighborhood the fact that he had seen the suspicious character at the_ depot on the night of the murder, was asked on cross-examination whether anybody in the neighborhood had given him any information of such a man being in that community. The purpose of the cross-examination was to show that the suspicious character seen near the place where the dead bodies were found was a stranger in the community, who might have committed the murders. The only objection urged against the evidence was that it was irrelevant. That objection has very little weight with regard to questions propounded on cross-examination of a witness for the prosecution. It is always relevant and permissible for a defendant, claiming that he is a victim of circumstantial evidence, to show how probable it is that some one else committed the crime.
 

 As to hill 33, my opinion is that the statement of the expert in pathology and bacteriology, with regard to his experiments and the result thereof, was too far-fetched to be admissible in evidence. Under the authority cited in the majority opinion, pie objection to the evidence ought to have been sustained.
 

 As to bill 43, I agree'with the statement in .the majority opinion that the question which the prosecuting attorneys put to their expert witness, on the value of finger prints or palm prints as evidence, is not to be commended. It was not right to challenge the defendant W. R. Dunn to give evidence in the case, and at the same time insinuate to the jury that it would be evidence against him, by asking the witness if he could then make a palm print of Dunn’s right hand, and, by comparing it with the photographic copy of a print which the witness said he had taken from the door of the automobile in which the dead bodies were found, tell whether the two prints were made by the same hand. The prosecuting attorneys might as well have challenged W. R. Dunn to take the witness "stand. It is said in the majority opinion that the challenge was not prejudicial to the defendant W. R. Dunn, because the prosecuting attorneys made no effort to carry out the test which they suggested in the question propounded to the witness, after he answered that he could make the test successfully. If the prosecuting attorneys had no intention of carrying out their suggestion, the question was not asked in good faith, or "for any other purpose than to challenge the witness to give evidence, and at the same time insinuate that, if he did furnish the evidence, it would be against him. The ruling of the judge overruling the defendants’ objection to the question, was a grievous error.
 

 As to, bill 45, I have expressed my opinion, in my comment on bills 1, 2, 3, 5, and 7. It was not right for the prosecuting attorneys, having members of the Ku Klux Klan on the jury, to invoke a prejudice against the witness for the defense by referring to the fact
 
 *607
 
 that he had testified as a witness called by the Attorney General in his investigation into the supposed murder of Daniels and Richards in Morehouse parish.
 

 I dissent from the rulings on bills 50 and 57. Eustice Dunn was indicted jointly with the two defendants who were on trial for the same murder. Act 157 of 1916 declares that a person
 
 charged
 
 with a crime — -not a person
 
 on trial
 
 for a crime — may,
 
 at his own request hut not otherwise,
 
 be a witness in the case, and that his neglect or refusal to testify shall not create a presumption against him. The decision cited in the majority opinion, State v. Johnson, 151 La. 625, 92 So. 139, is not at all appropriate to this case, because the witness whom the defendant failed to call to the witness stand in the Johnson case, being his mother, was not under indictment or accused of the crime for which he was being tried. Besides, the report of the decision indicates that the doctrine announced in that case was approved by only a minority' of the members •of the court.
 

 For the several reasons which I have stated, I respectfully dissent from the opinion and decree rendered in this case.